**Ronald GOLDMAN, Appellant,**

v.

**WHITE ROSE DISTRIBUTING COMPANY, Sherwin Goldman, Carol Minker, Gayle Johansen, and Joe Hopkins, Appellees.**

No. 2–96–029–CV.

Court of Appeals of Texas, Fort Worth.

Nov. 14, 1996.

Rehearing Overruled Jan. 9, 1997.

**394**

Kleber C. Miller, Shannon, Gracey, Ratliff & Miller, L.L.P., David E. Keltner and Craig M. Price, Haynes and Boone, L.L.P., Fort Worth, for Appellant.

James B. Barlow, Barlow & Garsek, Eugene J. Dozier, Thompson & Knight, Gordon Appleman, Fort Worth, for Appellees.

Before LIVINGSTON, DAUPHINOT and RICHARDS, JJ.

## OPINION

LIVINGSTON, Justice.

Appellant Ronald Goldman sued appellees White Rose Distributing Company, Sherwin Goldman, Carol Minker, Gayle Johansen, and Joe Hopkins for breach of contract because White Rose refused to pay Ronald money that he believed he was entitled to. White Rose counterclaimed, seeking actual and punitive damages from Ronald and claiming that he misused White Rose funds. During

trial, White Rose made certain statements conceding that part of the money was, indeed, Ronald's. After trial, White Rose refused to give Ronald the money.

Ronald filed this second suit to recover the money, but White Rose asserted that Ronald's claims were barred by res judicata. Ronald responded that White Rose was judicially estopped from asserting res judicata. The trial court granted summary judgment in favor of White Rose based on res judicata. Because we find that Ronald's judicial estoppel argument bars White Rose from asserting res judicata, we reverse and remand for trial.[1]

### BACKGROUND FACTS

White Rose, a wholesale liquor and wine distributing company, was a family business. Ronald and his three siblings, Sherwin, Carol, and Gayle, were the majority shareholders in the business. Joe Hopkins was a longtime White Rose employee who owned a small percentage of the business. Ronald was the only family member who was active in the daily management of the business. He was president from March 1973 until September 1989.

In 1988, Ronald and White Rose's attorney, Gordon Appleman, began negotiating the sale of White Rose's assets to another company, Tarrant Distributing Company. Ronald requested a "severance package" for all employees, including a $500,000 severance bonus for himself, allegedly so that White Rose's management team would stay on until the sale occurred. The board of directors approved a $350,000 severance bonus for Ronald to be made on the day of the sale. The sale was completed on June 23, 1989, and White Rose paid Ronald his severance bonus. The board then removed Ronald as president of White Rose and named Hopkins as the president.

Ronald's contract with White Rose entitled him to an annual bonus based on 10% of White Rose's net profit. White Rose paid Ronald a 1989 net profit bonus of $106,298, but Ronald calculated that he was entitled to a $305,914 bonus. Ronald arrived at the $305,914 bonus amount by including "pool money"[2] and certain sale proceeds[3] in White Rose's 1989 net profits.

In April 1990, Sherwin, Carol, and Gayle each received $689,045 as their share of the proceeds from the sale to Tarrant Distributing. Hopkins, because he held a smaller percentage of stock, received a smaller distribution. In January 1991, another distribution was made for the balance of the purchase price paid by Tarrant Distributing. Ronald was never paid any of these two distributions. Ronald's share of the distributions was $892,543.

### 1. The first lawsuit

Ronald sued White Rose, his siblings, and Hopkins for his unpaid 1989 bonus, his distribution amount from the Tarrant Distributing sale, tort damages for withholding those proceeds, and attorneys' fees. Ronald asked for $892,543 in actual damages for the lost distribution amounts, $305,914 for the unpaid bonus, and $1,000,000 in punitive damages. White Rose and the individual defendants counterclaimed against Ronald for his misuse of funds and for punitive damages.

At trial, counsel for White Rose[4] stated during opening argument:

> In fact, *that money that is Ronnie's share* out of the four million dollar purchase price, approximately, *was put in escrow* by the directors. *They were not trying to get his money,* but they wanted to make sure that something was there

---

1. Ronald also alternatively asserts that White Rose was equitably estopped from asserting res judicata. Because of our disposition of Ronald's judicial estoppel argument, we do not address his equitable estoppel assertion.

2. "Pool money" was money advanced to White Rose by liquor suppliers to be used by White Rose to promote the particular supplier's products.

3. The sale proceeds Ronald included were primarily compensation paid for a noncompetition agreement.

4. Unless stated otherwise, all references to White Rose include Sherwin, Carol, Gayle, and Hopkins.

until a jury could hear and decide on these claims as to what offsets there are about it, and then an audit committee was formed because Ronnie's brother and sisters had trusted and relied on him as a brother all during the years to do what was in their best interest and in the corporation's best interest. [Emphasis added.]

Hopkins testified that Ronald's distribution amount was "put in escrow until you [White Rose] get settled up with him." Carol and Sherwin also testified that Ronald's distribution money was "segregated." Hopkins further stated that "[n]obody is trying to take it [the distribution money] away from [Ronald]." Sherwin stated that they "needed to hold back that money" until the first lawsuit was resolved. During closing arguments, White Rose's counsel argued:

It is absolutely incorrect for anyone to argue that people are trying to get Ronnie's $892,000, whatever it is. The uncontradicted testimony is that was done with Gordon Appleman present. That was done when there were claims against the company that might exceed as in fact they have the claims—*the amounts that unquestionably is Ronnie's money. No one has ever tried to scheme to take that money from him.*

. . . .

They didn't breach any fiduciary duty. This question asks you about any damages by breach of the fiduciary duty. *It does not ask you about the $892,000 because they are perfectly willing to give that sum to him after it is all offset.*

. . . .

*No one is trying to get that part of Ronnie's money.* I hope I have made that clearly, but I believe even if my skills fail me, even if I lack the skill right now to portray in this amount of time they have appointed, you will know it, and you will know that is not what it is about, that that is a smoke screen, that this issue inquires, and I'm happy to have you inquire into the conduct of my clients. They never breached a fiduciary duty.

. . . .

*There is money that has to be paid to him as his distributive share after it is*

*offset,* and I hope that the jury will have some confidence in this fine trial judge and the veteran lawyers who have tried this case for both sides. You don't need to speculate once you get in there about what does this mean. Just call it as you see it. Let the judge and the lawyers straighten it all out. Don't worry about this amount of damages and say does that mean this or does that mean—Just answer the questions. If you do that, if you will mirror some of the confidence in us that we have in you. We'll have justice. [Emphasis added.]

The jury made the following findings:

- White Rose did not breach its employment agreements with Ronald.
- Ronald breached his fiduciary duties to White Rose and caused actual damages of $200,000.
- Punitive damages should be awarded against Ronald in favor of the individual defendants for $5,000 each for a total of $20,000.
- White Rose was entitled to recover $85,000 in attorneys' fees.

No issue was submitted on whether Ronald was entitled to the distribution money. The trial court entered a final judgment against Ronald for $200,000 in actual damages and ordered that "Ronald . . . take nothing by this suit and all claims asserted by . . . Ronald . . . in this cause are denied."

### 2. The first appeal

Ronald appealed the portion of the judgment that denied him the $305,914 bonus and granted an award of attorneys' fees against him. We affirmed the denial of the bonus, but reversed and rendered on the attorneys' fees. *Goldman v. White Rose Distrib. Co.,* No. 2–93–033–CV, slip op. at 20, 25 (Tex. App.—Fort Worth, June 15, 1994, no writ) (not designated for publication). We further stated that "that part of the judgment denying recovery as to Ronnie" was affirmed. *Id.* slip op. at 26.

### 3. The second lawsuit

In February 1995, Ronald requested that White Rose give him the distribution money

that he was owed from the Tarrant Distributing sale less the $200,000 the jury awarded to White Rose in the first lawsuit. White Rose refused to give Ronald the money, so Ronald filed a second lawsuit against White Rose.

White Rose asserted that res judicata barred Ronald's claims to the distribution money. White Rose moved for summary judgment on this ground and on the basis of the statute of limitations. Ronald countered that White Rose was judicially estopped from relying on res judicata because it took the position in the first lawsuit that Ronald was entitled to the escrowed money subject only to any offset that White Rose recovered in the first lawsuit. Ronald filed a motion for partial summary judgment based on judicial and equitable estoppel. Ronald's partial summary judgment motion did not move for judgment in his favor on the merits of his claims; he merely wanted to judicially estop White Rose from asserting res judicata.

A visiting judge denied Ronald's motion for partial summary judgment and granted summary judgment in favor of White Rose solely on the ground that res judicata barred Ronald's claims. Ronald appeals, claiming that the trial court erred in: (1) denying his partial motion for summary judgment; (2) granting White Rose's motion for summary judgment; and (3) restricting his discovery in the second lawsuit to matters occurring after judgment in the first lawsuit was entered.

## STANDARD OF REVIEW

■ We review the summary judgment granted in this case under the familiar standard: (1) the movant for summary judgment has the burden of showing that there is no issue of material fact and that the movant is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in the nonmovant's favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). When both parties move for summary judgment, each party must carry their own bur-

den as movant, and we should consider all of the summary judgment evidence accompanying both motions. *International Ass'n of Fire Fighters v. City of Baytown,* 837 S.W.2d 783, 786 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *Dae Won Choe v. Chancellor, Inc.,* 823 S.W.2d 740, 742 (Tex.App.—Dallas 1992, no writ). When a trial court grants summary judgment on a specific ground, we can only affirm the summary judgment if the theory relied on by the trial court is meritorious. *State Farm Fire & Casualty Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993).

## RES JUDICATA AND JUDICIAL ESTOPPEL

■ Res judicata is an affirmative defense that bars a subsequent suit if "it arises out of the same subject matter of a previous suit and which through the exercise of diligence, could have been litigated in a prior suit." *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 631 (Tex.1992). Ronald specifically pleaded for the recovery of the $892,543, which was the withheld distribution amount, in the first lawsuit. Although there was no jury issue on the distribution monies, this claim was partially litigated and could have been litigated to conclusion. Thus, res judicata applies to Ronald's claim to the distribution amounts.

■ Judicial estoppel holds that a party who has made a sworn statement in a pleading, a deposition, oral testimony, or affidavits in a judicial proceeding is judicially estopped from maintaining a contrary position in a subsequent proceeding. *Long v. Knox,* 155 Tex. 581, 291 S.W.2d 292, 294–95 (1956) (op. on reh'g). The doctrine is based on public policy that prohibits a litigant from maintaining inconsistent positions in separate judicial proceedings. Roger M. Baron & Melissa M. Martin, *The Application of Judicial Estoppel in Texas,* 41 BAYLOR L. REV. 447, 448 (1989); *see also Long,* 291 S.W.2d at 295. The purpose of the doctrine is "to uphold the sanctity of the oath and to prevent abuse of the judicial process." Baron & Martin, *supra,* at 459.

■ White Rose asserts that Carol's and Sherwin's testimony that the money was

"segregated" is not an admission subject to judicial estoppel that the money would not be withheld from Ronald once the first lawsuit was concluded. We agree that this testimony does not unequivocally establish that they would not dispute that Ronald was due the $892,543 less any offsets; the testimony merely establishes that the money was set aside.

However, Hopkins stated that nobody was trying to take the money away from Ronald, and Sherwin testified that White Rose "needed to hold back that money pending a resolution." White Rose responds that these statements merely show that the money was held for Ronald until the jury determined the merits of Ronald's claims. White Rose asserts that the jury denied Ronald's claim for the $892,543; thus, the "jury verdict and final judgment took [the $892,543] away," not White Rose.

We cannot agree with White Rose's position that the jury expressly found that Ronald was not entitled to the $892,543. As set out above, White Rose's counsel repeatedly told the jury that White Rose would give Ronald the money because "it has to be paid to him." Counsel further stated that the jury questions *did not* ask the jury to decide whether Ronald was entitled to the $892,543; all the jury was required to decide was the amount of offset that White Rose was due.

 White Rose claims that the statements made by its attorney during the first trial cannot be considered in determining judicial estoppel because that doctrine only applies to statements made under oath. However, an attorney is an officer of the court and, as such, is "an instrument or agency to advance the ends of justice." *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 162 N.E. 487, 489 (1928) (Cardozo, C.J.); *see also Howell v. State Bar of Tex.*, 843 F.2d 205, 207 (5th Cir.), *cert. denied*, 488 U.S. 982, 109 S.Ct. 531, 102 L.Ed.2d 563 (1988). An attorney may bind a party to a particular position. *See Sedgwick v. Kirby Lumber Co.*, 130 Tex. 163, 107 S.W.2d 358, 359–60 (1937) (counsel's statement in open court used by court to interpret the litigant's stance in petition); *Sepulveda v. Krishnan*, 839 S.W.2d 132, 135 (Tex.App.—Corpus Christi 1992) (at-

torney's statements in court could be judicial admission), *aff'd*, 916 S.W.2d 478 (Tex.1995); *Carroll Instrument Co. v. B.W.B. Controls, Inc.*, 677 S.W.2d 654, 659 (Tex.App.—Houston [1st Dist.] 1984, no writ) (party was bound by attorney statement during argument to court). Indeed, courts routinely rely on counsel's statements during oral argument and rely on these representations when deciding cases. *See, e.g., United States v. Lopez*, —— U.S. ——, —— & n. 4, 115 S.Ct. 1624, 1632 & n. 4, 131 L.Ed.2d 626, 641 & n. 4 (1995); *City of Sherman v. Henry*, 928 S.W.2d 464, 466 (Tex.1996); *Continental Airlines, Inc. v. Kiefer*, 920 S.W.2d 274, 281 (Tex.1996); *Childers v. A.S.*, 909 S.W.2d 282, 289 (Tex.App.—Fort Worth 1995, no writ); *Tinney v. Willingham*, 897 S.W.2d 543, 545 n. 1 (Tex.App.—Fort Worth 1995, no writ).

Although White Rose is correct that the attorney's statements are not evidence, they establish White Rose's legal position, i.e., that White Rose was not contesting Ronald's entitlement to the distribution money after any offsets that the jury might find. Counsel's statements can bind the client to that legal position. White Rose's attorney cannot tell the jurors that they are not being asked to determine the entitlement to the distribution monies and then inconsistently contend on appeal that the jurors did what they were told they did not have to do.

Hopkins's and Sherwin's testimony that the money was held back pending a resolution and that no one was trying to keep the money from Ronald establishes that they believed the money was Ronald's, less any offsets. Further, Hopkins's and Sherwin's statements considered together with White Rose's attorney's arguments are enough to show that White Rose was taking an inconsistent position in the first lawsuit from its position in the second lawsuit. Accordingly, White Rose is judicially estopped as a matter of law from asserting that Ronald is not entitled to the distribution monies.

 Our question now becomes which defense prevails: judicial estoppel or res judicata. We liken the relationship between res judicata and judicial estoppel in this case to the relationship between the statute of

limitations and fraudulent concealment. Proof of fraudulent concealment equitably estops the other party from relying on the statute of limitations as an affirmative defense to a claim. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex. 1996) (certified question under TEX. R. APP. P. 114); *Borderlon v. Peck,* 661 S.W.2d 907, 908 (Tex.1983). Thus, because Ronald proved judicial estoppel in his partial motion for summary judgment, White Rose is judicially estopped from relying on res judicata as an affirmative defense to Ronald's claims for the distribution monies. Even though the trial court was correct in finding that White Rose had proved res judicata, it erred in failing to find that judicial estoppel barred the affirmative defense. Accordingly, the trial court erred in denying Ronald's motion for partial summary judgment and in granting White Rose's motion for summary judgment. We sustain Ronald's first two points of error.

### DISCOVERY

In his final point of error, Ronald asserts that the trial court erred in restricting his discovery solely to matters that occurred after the first trial was concluded. White Rose objected to Ronald's request to depose Hopkins, Appleman, Carol, Gayle, and Sherwin. The trial court allowed Ronald to take the depositions but limited them to matters that occurred after November 6, 1992, the date of the final judgment in the first lawsuit.

Ronald alleges that the court's ruling "stifled [Ronald's] legitimate efforts to discover evidence relevant to his judicial and equitable estoppel responses to [White Rose's] *res judicata* defense." White Rose admits that the statements, which we have found establish judicial estoppel, were made in the first lawsuit. White Rose only disputes the "interpretation to be placed upon the testimony" and does not dispute the factual allegations made in Ronald's pleadings in this second lawsuit.

We held above that Ronald is entitled to partial summary judgment on the grounds that White Rose is judicially estopped from asserting that Ronald's claims are barred by res judicata. Because Ronald only sought

the information to establish judicial estoppel in response to White Rose's res judicata defense and because White Rose does not dispute the factual allegations in Ronald's suit, we find that the requested discovery is now moot. Ronald no longer needs the evidence to prove judicial estoppel. Ronald has not argued any other reason why the trial court abused its discretion or why he would still need the pre–1992 information; thus, we overrule as moot Ronald's third point of error.

### CONCLUSION

The trial court erred in granting summary judgment in favor of White Rose and denying Ronald's partial summary judgment on judicial estoppel grounds. As a result, the denied discovery is now unnecessary and moot. Accordingly, we reverse the summary judgment and render partial summary judgment in favor of Ronald that bars White Rose from asserting the affirmative defense of res judicata. We remand for a trial on the merits of Ronald's claims.[5]

---

**5.** Nothing in our opinion today affects the jury verdict in the first lawsuit.